IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

AIR PRODUCTS AND CHEMICALS, INC.,               )
                                                )
    Plaintiff and Counterclaim-Defendant,       )
                                                )
v.                                              )  Civ. No. 14-1425-SLR
                                                )
ERIC P. WIESEMANN, et al.,                      )
                                                )
    Defendants and Counterclaim-Plaintiff.      )

---

Timothy M. Holly, Esquire of Connolly Gallagher LLP, Wilmington, Delaware. Counsel for Plaintiff and Counterclaim-Defendant. Of Counsel: Oliver D. Griffin, Esquire, Peter N. Kessler, Esquire, and Melissa A. Bozeman, Esquire of Kutak Rock LLP, Philadelphia, Pennsylvania.

Robert S. Saunders, Esquire, Joseph O. Larkin, Esquire, Matthew P. Majarian, Esquire, Jessica R. Kunz, Esquire, Kathryn S. Bartolacci, Esquire, and V. William Scarpato, III, Esquire of Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware. Counsel for Defendants and Counterclaim-Plaintiffs.

---

**OPINION**

Dated: February 27, 2017
Wilmington, Delaware

ROBINSON, Senior District Judge

## I. INTRODUCTION

On May 31, 2013, plaintiff Air Products and Chemicals, Inc. ("Air Products") acquired EPCO Carbon Dioxide Products, Inc. ("EPCO") and Louisiana Leasing, Ltd. of Illinois ("LLL") from its stockholders, defendants Eric P. Wiesemann ("Wiesemann"), Kathryn Elizabeth Barker Trust, Grant Raymond Barker Trust, Tyler James Barker Trust, Mary Alyce Blum, Carl R. Buck, Davin James DeGeus Trust, Dale Del Sasson Family Trust, Ramon Del Sasso, Craig D. Dixon, Gail D. Dixon, Michael F. Duffy, Sr., Paul E. Gantzert, Mary Jo Gregorich, Dorothy Kaluzny Trust, Roberta Kavanaugh, Joseph A. Komar, Jr., Kathleen Komar, Michael Komar, Sophie H. Komar Trust, Susan Komar, Donald Laasch, Lori D. Longueville, Sandra Mayerhofer, James K. Murphy, Cheryl Nolden, Leon Odle, David Rogers, Rosedel, LLC, Mary L. Wachtl, Denise Wiesemann, Zerebny Revocable Trust, and Grady Collins (collectively, the "Seller Defendants"). Wiesemann is also the founder of EPCO and served as its Chief Executive Officer up until the acquisition; defendant Darrel Craft ("Craft") served as President (collectively with Seller Defendants, the "Defendants").[1] Air Products has brought claims against the Seller Defendants for breach of contract and unjust enrichment, and against Wiesemann and Craft for securities fraud, common law fraud, and negligent misrepresentation. (D.I. 48 at ¶¶ 183-340) The claims are based on EPCO's compliance with Department of Transportation regulations governing drivers' hours of service and the condition of EPCO's plant equipment and fleet. (D.I. 48; D.I.

---

[1] Although Air Products brought different claims against the Seller Defendants and the individual defendants (Wiesemann and Craft), the generic label "Defendants" is used throughout the briefing and, therefore, the court will follow suit.

206)  Craft has counterclaimed for breach of contract based on a consulting agreement
dated May 15, 2013.  (D.I. 57 at ¶¶ 135-39)

The court held a bench trial between May 23 and June 2, 2016, and the parties
have completed post-trial briefing. (D.I. 206, 207, 208, 209)  The court has jurisdiction
over the matter pursuant to 28 U.S.C. § 1332(a).  Having considered the documentary
evidence and testimony, the court makes the following findings of fact and conclusions
of law pursuant to Fed. R. Civ. P. 52(a).

## II.   FINDINGS OF FACT

### A.   Parties

At the time of the acquisition, EPCO was a privately-held company that produced
and distributed liquid carbon dioxide.  (JTX 020)  It was based in Monroe, Louisiana,
had 11 plants throughout the United States, and employed approximately 100 truck
drivers.  (JTX 007-006; D.I. 204 at 1272:3-1273:7)  LLL owned tractors and trailers
leased solely to EPCO.  (JTX 020)  The acquisition allowed Air Products to add liquid
carbon dioxide to its North American gases portfolio.  (Id.; JTX 007-005)

### B.   Relevant Provisions of the Stock Purchase Agreements

The acquisition is governed by the EPCO Stock Purchase Agreement and the
LLL Stock Purchase Agreement (collectively, the "SPAs").  (JTX 839; JTX 721)  Air
Products claims that the Seller Defendants breached the following representations and
warranties in both SPAs: Section 4.7 (Tangible Assets), Section 4.20 (Financial
Statements), and Section 4.23.1 (Compliance with the Law).

Section 4.7 of the EPCO SPA provides, in relevant part, that:

> [A]ll of the Tangible Assets are in good working order, repair and
> operating condition (ordinary wear and tear only excepted), are, to the

2

> Company's Knowledge, free from design or structural defects including
> any latent defects and are suitable for the uses for which such Tangible
> Assets are used in the conduct of the Business.

(JTX 839-021)  "Tangible Assets" is defined as "all of the tangible assets of the

Company owned, leased, used or held for use in the operation of the Business ...."

(JTX 839-112)  There is no dispute that the assets at the heart of Air Products' claims

are covered by Section 4.7.  "Company's Knowledge" essentially means the "actual

knowledge" of Wiesemann and Craft and any knowledge they "would have had after

reasonable inquiry."  (JTX 839-105; JTX 839-109)  Section 4.7 of the LLL SPA does not

contain the exact same language, but the parties have litigated as if there are no

differences in meaning.[2]  Because the parties have focused exclusively on Section 4.7

in the EPCO SPA, the court will similarly rely only on that provision.

Section 4.20 of both SPAs provides, in relevant part, that:

> [T]he Financial Statements ... were prepared in accordance with GAAP
> and all applicable Legal Requirements. All of the Financial Statements
> are true, complete and correct, contain no untrue statement of a material
> fact, do not omit any material fact necessary in order to make such
> Financial Statements not misleading and are a true, complete and correct
> reflection of the operations of the Company for the periods described
> therein.

(JTX 839-033; JTX 721-026)  "Financial Statements" essentially means the audited

balance sheets of the company and related statements for fiscal years ending

September 30, 2010, 2011, and 2012, and the unaudited balance sheet of the company

and related statements for the seven months ending April 20, 2013.  (JTX 839-107)

---

[2]     Specifically, the LLL SPA states, unlike the EPCO SPA, that all of the Tangible
Assets "have been maintained in accordance with good industry practice, are, to the
actual knowledge of Wiesemann, Darrel Craft, Joseph Worley, or any other officer or
director of the Company, in good working order, repair and operating condition (ordinary
wear and tear only excepted)...."  (JTX 721-014)

Section 4.23.1 of both SPAs provides that EPCO and LLL operated in compliance with the law. Specifically, it states, "the Company has conducted its business and affairs, and has been and is in compliance with all material Legal Requirements which are applicable to the Assets, the Business and its operations." (JTX 839-034; JTX 721-027) "Legal Requirements" means "any statute, law, ordinance, rule, [or] regulation … issued, enacted or promulgated by any Governmental Authority or any arbitrator." (JTX 839-109; JTX 721-072) "Governmental Authority" includes any federal regulatory agency and its subdivisions, such as the Department of Transportation and its subdivision, the Federal Motor Carrier Safety Administration. (JTX 839-107; JTX 721-070)

Article 4 of the SPAs starts with a preamble stating that EPCO and LLL make these representations and warranties "as of the Closing Date." (JTX 839-019; JTX 721-011) Section 10.1.1 further provides that the representations and warranties "shall be true and correct in all material respects … as of the Closing Date," which the parties represent is May 31, 2013. (JTX 839-051; JTX 721-039; D.I. 206 at 2) Finally, Section 12.2.1(d) of both SPAs provides that the representations and warranties in Sections 4.7, 4.20, and 4.23.1 "survive the Closing" and will terminate on November 30, 2014. (JTX 839-056; JTX 839-106)

On May 31, 2013, Air Products and Seller Defendants also executed the EPCO Escrow Agreement and LLL Escrow Agreement. (D.I. 185 at 12; JTX 839-013; JTX 721-008) Pursuant to the escrow agreements, Air Products deposited a total of $15,870,000 into two escrow funds. (D.I. 185 at 12) Indemnification paid from the escrow funds is Air Products' "sole and exclusive remedy" for any "Losses" related to a

4

"breach of any representation and warranty" in Article 4 of the SPAs. (JTX 839-013,

054—057 (§§ 2.5, 12.1.1, 12.3 & 12.4.3); JTX 721-008, 042—46 (§§ 2.3 & 12.1.1,

12.3.1 & 12.4.3)) Any indemnification for Losses is subject to a deductible and a cap.

Under the EPCO SPA, Air Products is not entitled to indemnification unless and until the

aggregate Losses exceed $1,008,000. (JTX 839-057) Under the LLL SPA, the Losses

must exceed $50,000. (JTX 721-045) Moreover, Air Products cannot be indemnified

for more than the amount in escrow. (JTX 839-057; JTX 721-046) For claims of fraud,

there is no exclusive remedy, deductible, or cap. (JTX 839-058; JTX 721-046)

Finally, the SPAs contain an "anti-sandbagging" provision that prohibits Air

Products from making indemnification claims based on information it knew before

closing. (JTX 839-059; JTX 721-047) Specifically, the SPAs provide:

> No Seller shall be liable … for any Claim or Losses resulting from or
> arising out of or relating to any inaccuracy in or breach of any of the
> representations or warranties … contained in this Agreement …, if [Air
> Products] had knowledge of such inaccuracy or breach prior to the date
> of this Agreement, where such knowledge was acquired because the
> facts and circumstances relating thereto were clear on their face from
> information or materials provided by the Company, the Sellers, or the
> Sellers' Representative, and not merely knowledge of the underlying
> facts and circumstances of such inaccuracy or breach.

(JTX 839-059; JTX 721-047) For the purposes of this section, "knowledge" means "the

actual knowledge of Stanley L. Reggie," a member of Air Products' mergers and

acquisition group. (JTX 839-059; JTX 721-047; D.I. 202 at 698:7-10)

## C.    Hours of Service

EPCO's trucking activities are regulated by the Federal Motor Carrier Safety

Administration ("FMCSA"), an agency within the Department of Transportation. Air

Products claims that Defendants failed to accurately disclose EPCO's "knowing, regular,

and planned" violations of FMCSA regulations governing drivers' hours of service. (D.I.

5

206 at 1) The court has grouped the evidence presented on this issue into four categories: government regulations and compliance programs, testimony and documents from EPCO's management and drivers, testimony and documents from Air Products' due diligence team, and, expert testimony.

### 1. Regulations

This section outlines the FMCSA regulations governing drivers' hours of service and drivers' logs, describes EPCO's internal controls used to ensure compliance with those regulations, and concludes with the results from audits of EPCO's compliance.

### a. Hours of Service Regulations and Driver's Logs

Section 395.3 of the FMCSA regulations provides that: (i) a driver is limited to 11 hours of driving per 14-hour duty shift; (ii) a driver must have 10 hours off between duty shifts; and (iii) a driver can be on duty no more than 70 hours within 8 consecutive days (collectively, the "HOS Regulations"). 49 C.F.R. § 395.3. For example, if a driver came to work at 6:00 a.m., he cannot drive a truck after 8:00 pm, which is 14 hours later. FMCSA, *Interstate Truck Driver's Guide to Hours of Service*, at 3 (Mar. 2015). A driver "may do other work after 8:00 pm, but … cannot do any more driving until [he] has taken … 10 consecutive hours off." *Id*. The FMCSA does not require 100% perfection. (D.I. 204 at 1384:24-1385:1) Under FMCSA's enforcement protocols, a motor carrier is considered in violation of the HOS Regulations when its non-compliance rate goes over 10%. (D.I. 202 at 645:9-646:20; D.I. 204 at 1384:20-23)

Drivers are required to keep a record of their hours of service on a duty status log. At the time of the acquisition, FMCSA regulations did not require electronic logs. 49 CFR § 395.8(a). Instead, drivers could log their duty status "manually" on a paper

6

grid in the form provided in the regulations, as EPCO did.  49 CFR § 395.8(a)(iv)(C).

Each grid covered one 24-hour period.  *Id.*  Duty status must be recorded as "off duty,"

"sleeper berth," "driving," or "on-duty not driving."   49 CFR § 395.8(b).  For each

change of duty status, the driver must record the name of the town, with a state

abbreviation.  49 CFR § 395.8(c).  The driver also has to include the following

information on each log: (1) the date; (2) total miles driven for that day; (3) truck and

trailer number; (4) name of carrier; (5) driver's signature; (6) 24-hour period starting

time; (7) main office address; (8) remarks; (9) name of co-driver; (10) total hours; and

(11) shipping document number or name of shipper and commodity.  49 CFR §

395.8(d).  Finally, FMCSA regulations provide that "[n]o driver or motor carrier may

make a false report in connection with a duty status."  49 CFR § 395.8(e)(1).

### b.  Internal Controls

Air Products claims that, before the acquisition, EPCO's internal controls were

deficient, thereby masking the routine violation of HOS Regulations.  (D.I. 206 at 9-10)

EPCO monitored compliance with HOS Regulations through administration of the

drivers' logs and communications between drivers and dispatch.  (D.I. 201 at 296:23-

297:2)  From 2006 to 2013, Candie Rowton ("Rowton") worked at EPCO as a

transportation specialist and administered the drivers' logs.  (D.I. 200 at 195:4-10,

198:12-14)  Rowton would make sure that a driver submitted a log for every day he

drove and that the log looked proper on its face.  (*Id.* at 196:22-197:2)  She was not

tasked with cross-checking the drivers' logs against other data to root out any

falsifications.  (*Id.* at 196:17-20)  After inspecting the logs, Rowton stored them in the

drivers' file.  (*Id.* at 197:20-24)

7

At some point, EPCO enabled RapidLog, a commonly used log auditing tool within the trucking industry. (D.I. 202 at 610:23-611:17) With RapidLog, a company scans a log into the program, and the program identifies any errors. (*Id.*) Errors could include missing signature, incorrect adding of mileage, potential speeding, and hours of service violations. (*Id.*; D.I. 201 at 293:8-294:13) Rowton testified that RapidLog identified a "high volume" of violations she considered "nitpicky" and "very, very time consuming" to investigate. (D.I. 200 at 198:9-18, 214:2-13) Rowton was the only person at EPCO responsible for administering the logs, which made it difficult for her to stay on top of all the paperwork. (*Id.* at 198:16-17, 209:18-23) At some point she stopped scanning the logs although she continued to eyeball them. (*Id.* at 213:6-8) Rowton estimates that this may have lasted for several years. (*Id.* at 198:19-199:14) The record indicates that Rowton was only nine months behind when she left. (*Id.* at 59:1-5) Regardless, when Craft discovered that Rowton was behind on scanning logs, he brought in his son to eliminate the backlog. (*Id.* at 59:3-8; D.I. 203 at 1062:3-1063:1)

### c. Regulatory Controls

A motor carrier is subject to three levels of regulatory scrutiny to ensure compliance with FMCSA regulations. First, state and federal officers can conduct roadside inspections that can include looking at the driver's log book. (D.I. 204 at 1371:19-1372:20, 1379:2-10) Second, FMCSA can conduct a focused audit that evaluates a particular aspect of a motor carrier's operations. (*Id.* at 1372:20-25, 1379:11-19) Finally, FMCSA can conduct a full audit, called a "compliance review." (*Id.* at 1369:23-24, 1379:20-1380:3)

A compliance review is an on-site inspection used to determine a motor carrier's safety rating. 49 CFR Pt. 385 App'x B Para. II(C)(a). The safety rating is reported as "satisfactory," "conditional," or "unsatisfactory." *Id.* at Para. III. FMCSA uses six factors to determine the safety rating: general, driver, operational, vehicle, hazardous materials, and accident rate. *Id.* at Para. II(C)(a) & III. Each factor is comprised of a group of regulations with similar characteristics that FMCSA considers "acute and critical." *Id.* at Para. II(a) & II(C)(a). For example, the driver factor is comprised of the following parts of the FMCSA regulations: Part 382 (controlled substance and alcohol use and testing); Part 383 (commercial driver's license requirements); and Part 391 (qualifications of drivers). *Id.* at Para. II(f). The operation factor is comprised of Part 392 (driving of commercial motor vehicles) and Part 395 (hours of service). *Id.* Each part contains several subparts, which in turn contain multiple individual regulations. Thus, the HOS Regulations are just a few out of hundreds of regulations that determine EPCO's safety rating.

In addition to audits by FMCSA, EPCO had independent third-parties complete mock audits. (D.I. 204 at 1286:17-18) In November 2012, EPCO had Ryder Systems complete a mock audit. (JTX 209) Ryder Systems found that "evidence of regulation training material and the experience of managers indicate[d] a support of highway safety." (*Id.*) It noted some concerns with how certain paper logs were completed, but overall concluded that the paper logs were "in fair order." (*Id.*)

### 2. EPCO Management and Drivers

Six members of EPCO management had a role in the company's trucking activities: the Director of Safety, the Director of Maintenance, the Director of Logistics,

9

the Vice President of Transportation, the President, and the CEO. (D.I. 201 at 289:13-
14) Joseph Worley ("Worley") joined EPCO as Vice President of Transportation in
October 2012, replacing Dana Worster ("Worster"). (*Id.* at 251:5-18, 287:14-16) John
Esposito ("Esposito") served as the Director of Safety; Danny Dabbs ("Dabbs") served
as the Director of Maintenance; and Todd Demler ("Demler") served as the Director of
Logistics. (*Id.* at 288:19-289:14) Esposito, Dabbs, and Demler reported to Worster,
and then Worley. (*Id.*) Esposito was responsible for ensuring EPCO's compliance with
FMCSA, OSHA, and EPA regulations. (*Id.* at 289:21-23, 249:11-15) Dabbs oversaw
maintenance and refurbishment of the trailers. (*Id.* at 290:14-23) Demler was
responsible for dispatch, including planning delivery trips and schedules. (*Id.* at 290:24-
291:4; D.I. 203 at 1110:7-14, 1193:5-23) Worley reported to Craft (the President), who
reported to Wiesemann (the CEO). At trial, the parties presented testimony from
Esposito, Demler, Worley, Craft, Wiesemann, and a temp-to-hire driver named Frank
Frost.

### a. Esposito

Esposito was the Director of Safety from April 2011 to November 2012. Air
Products relies on Esposito's testimony to show that EPCO drivers ran illegal, and that
Wiesemann and Craft knew. (D.I. 206 at 6-7, 12) The court gives little weight to
Esposito's testimony for two reasons. First, he left EPCO in November 2012. (D.I. 201
at 249:1-3, 252:21-23) Thus, he lacks personal knowledge of the conditions at EPCO
for the six-month period before closing, the time period critical to Air Products' claims.
The court cannot assume that EPCO's operations were the same before and after
Esposito's departure, particularly when the Vice President of Transportation changed

10

around that same time. Second, there is a preponderance of evidence in the record, some from Esposito himself, contradicting Air Products' characterization of his testimony.

For example, in June 2011, Esposito implemented an automatic point system he devised to address DOT violations. (JTX 235; JTX 241) After a driver accumulated a certain number of points, he was supposed to be terminated. (JTX 235) The program was shut down by August 2011. (JTX 241) Air Products touts the quick abandonment of the program as evidence that Craft and Wiesemann did allow Esposito to punish unsafe drivers. (D.I. 206 at 6-7) Notably, in Esposito's email announcing the program, two drivers received points, for a brake violation and logbook violation respectively, while eight drivers were "commended for being a safety professional," indicating that the majority of EPCO's drivers were safe. (JTX 235) More important, drivers were automatically given points not only for DOT violations but also for an "unprofessional" attitude, which has nothing to do with unsafe driving. (*Id.*; JTX 239; D.I. 201 at 259:15-22) Finally, Esposito testified that neither Craft nor Wiesemann were "in the loop" on the point system. (D.I. 201 258:4-20) The point system was eliminated at the direction of Senior Vice President Ken Niemeyer ("Niemeyer"), because he thought it was "unfair." (JTX 241; D.I. 201 at 262:1-17) According to Esposito, Niemeyer did not care what Wiesemann or Craft thought, "[h]e was going to do it his way." (D.I. 201 at 262:1-17) Thus, there is no evidence that either Wiesemann or Craft interfered with the implementation of this program or that the program was an effective, as opposed to arbitrary, method to curtail unsafe driving behavior.

Air Products also emphasizes Esposito's testimony that he lacked autonomy to fire unsafe drivers. (D.I. 206 at 6; D.I. 201 at 250:3-251:6, 273:4-21) Esposito's testimony, however, is inconsistent with his own contemporaneous emails. In June 2012, Demler sent an email to Esposito writing in all caps, "STOP FIRING DRIVERS WITHOUT TALKING TO MYSELF AND THE REGIONAL DISPATCHER!" (JTX 243-002) Esposito replied, "I was given complete permission by our CEO to fire any driver I deem a risk to our safety program." (JTX 243) Esposito also testified that he "got rid of plenty" of drivers in his short time at the company. (D.I. 201 at 260:1-19) Thus, the evidence suggests, contrary to Air Products' assertions, that Esposito had the autonomy to fire unsafe drivers.

### b. Demler

Air Products relies on Demler's testimony to show that EPCO drivers falsified their logs, violated HOS Regulations, and Craft was aware of both issues. (D.I. 206 at 4) Demler estimated that about ten percent of EPCO's drivers were regularly violating HOS Regulations. (D.I. 200 at 52:6-16) Specifically, Demler was asked if "EPCO's drivers consistently keep the hours of service?" (*Id.*) He replied:

> Well, if you look at their logs, they probably did. But, you know, if you looked at the amount of runs that were being done or if you looked at the daily boards, it was pretty easy to see that some of them were going, you know, outside hours quite regularly. I'd say about ten percent of the driver pool.

(*Id.*) When asked to explain his assessment, Demler testified that he thought it was "too much" for drivers to complete multiple trips on certain routes in one day, but drivers were doing it. (D.I. 200 at 52:22-53:16) The court gives this testimony little weight. Demler concedes the "ten percent" was a "ballpark" number and was not based on an analysis of any logs or verifiable data. (*Id.* at 108:8-109:4)

12

Air Products places great emphasis on Demler's testimony that Craft used the code word "ahem" when he meant "illegal." (D.I. 206 at 11; D.I. 200 at 61:22-24; D.I. 203 at 1060:4-14)  The only email where Craft uses "ahem" is from March 10, 2013. (JTX 132)  In that email chain, Craft asked Demler and Kent Daniels ("Daniels") to explain EPCO's policy regarding a driver's "day off." (Id.)  Craft was under the impression that any driver not on vacation or out of hours was available to work and, therefore, not "off." (Id.)  Demler responded that a day off was a "4 on 4 off driver being called in on his 4 off cycle, or a 5 and 2 driver being called in on his day off." (Id.; D.I. 200 at 61:6-11)  Craft responded, "But we were paying them to run ... ahem when they were out of hours ... correct?" (Id. (ellipses in original))  Daniels responded, "Probably most of the time.  But probably some isolated cases where they may not have been."[3] (Id.)  Daniels' response suggests that any driving on the off day was illegal.  Demler testified that a four days on / four days off schedule maximized fleet utilization and, if the driver was needed on a fifth day, "then you're running a perfectly legal five and two." (D.I. 200 at 61:6-11)  The court notes that 4 days at 14 hours each equals 56 hours, which does not exceed the 70-hour HOS Regulation.  Five days at 14 hours each, however, does equal 70 hours a week.

More troubling to the court is Demler's use of "ahem" in an email chain on March 12, 2013.  (JTX 131)  Demler emailed Craft that "all [logistical] fires are out at the moment." (Id.)  Demler added, "Got [a driver] to run (**AHEM**!) back to back TNT's after

---

[3]     Daniels added that the practice "Mainly was started by [Worster];" "it got out of control with [Worster];" and "Nothing [about the policy] has ever been in the handbook to my knowledge." (JTX 132)  There is no evidence in the record as to why Worster left EPCO in the fall of 2012.

13

he already ran a Birchwood as his first run." (*Id.* (emphasis in original)) "25 runs today

with 10 drivers … do the math (that's 5 AHEM! runs)." (*Id.*) "AHEM = Extra, or runs

above the call of duty." (*Id.*) Craft responded, "define above the call of duty…not sure

where [Worster's] dictionary is but would you STOP referring, using, following it????"

(*Id.*) If Demler understood the word "ahem" to mean illegal, his repeated admission in

the March 12 email that he solved logistical problems by asking multiple drivers to

complete "ahem" runs is troubling.

The court draws from these March 2013 emails that Craft was given reasons to

suspect instances of illegal driving. At trial, Craft admitted:

> EPCO was not perfect. We knew we had some hours of service [issues].
> From time to time, the driver would get cited for running over hours either
> by the DOT roadside stops or we found some through the scanning of
> our logs. We had our guys out in the field … working with these drivers
> and we had cases where we were firing drivers.

(D.I. 203 at 1066:19-25) The court cannot draw from these emails, however, that Craft,

himself, knowingly allowed or directed drivers to violate HOS Regulations. The court

also cannot conclude that Craft ignored the red flags raised by the four-on four-off

schedules or Demler's "ahem" trips, because there is no evidence in the record as to

what policies Craft did or did not implement in response. (D.I. 203 at 1059:20-1060:15,

1082:14-1093:4)

### c. Worley

Air Products relies on Worley's testimony to show that Wiesemann and Craft

resisted efforts to ensure compliance with the HOS Regulations. (D.I. 206 at 7, 11, 13-

14) Before hiring Worley in October 2012 to be the Vice President of Transportation,

Craft emailed Wiesemann:

I plan to offer him the job today...Also I will tell you, [Worley] is a stickler on DOT. He asked me point blank if we ran illegal. I told him ... I do not know that for a fact, but imagine there are times when we do. And it will be your job to make sure we get the job done without doing that. This is going to be a tough nut because of the way we try to cover plants. I have no firsthand knowledge but suspect there are times it is a problem. [Worley] made it clear, he is not going to put up with ANY illegal loads.

(JTX 190) Air Products presents this email as evidence that Craft and Wiesemann did not want to hire Worley, because he would not run illegal. (D.I. 206 at 11) The court is not persuaded, because Craft and Wiesemann had complete control over whether Worley was hired. As Craft testified at trial, "if we wanted to run a non-compliant business, this was the wrong guy to hire." (D.I. 203 at 1067:6-10)

Craft testified that he thought EPCO would be a "tough nut" for Worley to crack, because of multiple logistical challenges. (Id. at 1066:1-7) According to Demler, Worley would be "in for kind of a rude awakening," because EPCO "didn't have enough equipment" or "enough drivers." (D.I. 200 at 67:10-68:15) This is consistent with Craft's statement in the email that if Worley "can get enough drivers, then pay becomes the issue and will have to do what we need to do to keep them." (JTX 190) These are some of the same logistical challenges that Air Products has faced in managing EPCO.

There is a preponderance of evidence that Worley vigorously enforced DOT compliance at EPCO, as expected. Worley sent EPCO's drivers "exception reports" on a regular basis to notify them of logbook errors and HOS violations. (D.I. 201 at 357:20-358:11) One of his first acts after getting the job was to hire an outside firm to conduct a mock audit of EPCO's driver logs. (Id. at 359:16-361:9) Worley promptly forwarded the results of the mock audit to Craft, stating, "I will develop an action plan to address the recommendations." (Id. at 360:18-361:9) After FMCSA completed an audit in March 2013, Worley again promptly informed Craft of the results and formulated an action plan

15

to address any deficiencies. (JTX 201) Worley also sent the results of the FMCSA audit to EPCO's drivers with their paycheck, to provide feedback that would improve performance. (D.I. 201 at 358:6-11)

There is also a preponderance of evidence that, as expected, Worley was constantly challenged by the lack of drivers. Craft testified that EPCO was "always actively trying to find and hire drivers," and Worley was under "a lot of pressure to get the head count up" to prepare for the summer peak. (D.I. 203 at 1068:9-16) Between February 2013 and April 2013, Worley had several meetings with Wiesemann to voice his concerns that EPCO had to "get more drivers to meet the demands of the customer." (D.I. 201 at 300:21-25, 303:25-304:10) As Worley explained, "we [didn't] have enough hours … to do what needed to be done based upon the parameters we had." (Id. at 302:1-16) Worley believed that, to the degree there were problems with hours of service compliance, "[t]he root cause was lack of drivers." (Id. at 299:1-300:17, 301:1-6) When Worley approached Wiesemann about the issue, Wiesemann would respond with disbelief, indignation, an assertion that it was "[Worley's] problem," that he had "plenty of drivers," or that he "need[ed] to plan better." (Id. at 300:21, 301:12-19, 302:1-16, 304:13-17, 308:8-21)

Nevertheless, Worley also testified that he and Wiesemann worked together to identify additional sources of drivers, and that he in fact hired additional drivers. (D.I. 201 at 305:4-305:25) Craft recalls that Worley hired over 20 drivers between January 2013 and May 2013. (D.I. 203 at 1068:5-7) The record also indicates that an industrywide shortage, not just Wiesemann's attitude, contributed to the difficulty in hiring drivers. (See D.I. 200 at 46:6-10 (Demler testifying that "drivers are an issue not

16

just at EPCO, but everywhere," because there is an "industrywide shortage"); D.I. 204 at
1210:1-2 (Camilli testifying that "the United States is faced with a driver deficit."))
Worley said the driver shortage persisted under Air Products and he "never knew of a
time that [he] wasn't trying to hire drivers." (D.I. 201 at 306:1-5)

Finally, Worley testified that he was "highly suspicious that drivers were falsifying
their logs," but he did not "possess any proof that they could do it or that they did do it,"
even though he "tried to put it together and prove it." (*Id.* at 341:17-24)  Worley
explained that "every day with that many drivers, somebody's going to do something
wrong…[I]t just happens." (*Id.* at 341:20-24)  He also credibly testified that he never
deliberately or intentionally ran drivers illegally. (*Id.* at 353:2-25)

### d.  Craft and Wiesemann

Defendants presented Craft's testimony to explain why Air Products' poor
management of EPCO post-acquisition contributed to its losses and Wiesemann's
testimony to explain some of his more troubling emails in the record. (D.I. 207 at 8, 31,
36)  As Craft explained, the production of carbon dioxide, unlike other industrial gasses
in Air Products' portfolio, is entirely dependent on feedstock sources that have much
greater variability and volatility. (D.I. 203 at 1066:1-18, 1105:25-1106:3, 1172:9-19)
Moreover, carbon dioxide customers typically have limited storage capacity and their
daily usage often varies dramatically, requiring frequent, just-in-time deliveries. (*Id.* at
1101:10-14)

Wiesemann, as a result, was very active in managing EPCO.  (JTX 880-015; D.I.
200 at 64:1-11)  He reviewed the dispatch boards daily and provided comments on
anything he thought was planned incorrectly.  (D.I. 200 at 64:7-65:13)  Several emails

indicate that employees felt "micromanag[ed]" and unable to "challenge him on anything."   (JTX 246; JTX 880; JTX 878; D.I. 200 at 64:5-9) "[E]ven after being proven wrong by pure cold hard factual data … he is always right, and everyone else is wrong if they do not agree."  (JTX 880)  Moreover, Wiesemann frequently caused stress by demanding that employees never say no to a sale and always pull product from EPCO plants if the storage tanks were not empty.  (D.I. 200 at 80:5-21; JTX 153)  As Wiesemann said, "I don't care what the rationale, when we have product at our plants we are not going to buy from other people.  Period."  (JTX 153)

For example, in November 2012, Demler prevented a run out for a customer in Holton by purchasing product from a third-party in Pekin instead of pulling it from EPCO's plant in Monroe which, at double the distance, could not be legally driven in one day.  (JTX 150)  Even though the purchase actually saved money, Wiesemann told Demler, "NO MORE.  Plan better."  (JTX 150-003 (emphasis in original))  Similarly, in March 2013, EPCO received a last minute request from an infrequent customer at a time when only two drivers had unused hours of service and other deliveries to complete.  (JTX 155)  Although several members of EPCO's management, including the Regional Planning Manager, Director of Logistics, and Vice President of Sales, had concluded that EPCO could not fulfill the request, Wiesemann responded, "I do not accept this.  Find the damn drivers if this customer is willing to pay."  (*Id.*)  While these emails demonstrate that Wiesemann was an aggressive, obstreperous manager, they are insufficient proof that his demands were actually met by violating the relevant HOS Regulations, especially when viewed in light of Demler's testimony that he addressed

18

the above described crises in a legally compliant manner. (D.I. 200 at 98:24-25, 106:21-107:2).

### e. Frost

The only driver testimony Air Products presented is from Frank Frost, a temp-to-hire driver from Trillium Drivers. Frost trained with EPCO for about a week before close. On May 28, 2013, Demler emailed Peggy Lemke ("Lemke"), the manager at Trillium Drivers who coordinated Frost's placement at EPCO. (JTX 138) Demler said, "I think [Frost] is a good driver and seems to be picking things up quickly, but I'm hearing issues with overall attitude that concern." (Id.) Lemke responded that there was no need to worry about Frost, because he decided not to return to EPCO. (Id.) Lemke relayed Frost's reasons, which included "[r]unning illegal and expected to run illegal." (Id.)

The evidence suggests that Frost does not have personal knowledge that EPCO drivers violated HOS Regulations but, instead, he is conveying his impressions or repeating what other drivers told him. Frost testified that he attended an EPCO safety meeting where half of the drivers looked fatigued, and he overhead that they were working 18 hours a day. (D.I. 200 at 163:2-17) Because drivers can work (but not drive) after 14 hours, even if these statements were true, it does not necessarily mean HOS Regulations were violated.[4] *See* FMCSA, *Interstate Truck Driver's Guide to Hours of Service*, at 3 (Mar. 2015); *see also* D.I. 201 at 337:21-22 ("[T]he legal law is we can't drive after being on duty for 14 hours, but it's possible to be working past 14 hours.").

---

[4]     For the same reason, the court does not find, as Air Products asserts, that other temp-to-hire pay requests show violations of HOS Regulations on their face. (D.I. 206 at 4-5; JTX 215; JTX 220 (showing temp-to-hire driver worked 14.25 hours and 15.25 hours))

19

In addition, Frost testified that he watched his trainer falsify his logs twice. (D.I. 200 at 166:23-167:1)  Specifically, Frost said the trainer "would log his 18 hours as he did it in 14." (*Id.* at 166:8-19)  Frost testified that he knew what his trainer wrote, because his logs had to mirror his trainer's. (*Id.* at 166:23-167:1)  However, Frost submitted a pay request to Trillium for 58 hours of work in 5 days, which means he worked on average less than 12 hours per day. (JTX 138-002)  Even if drivers falsified their logs to hide HOS violations, they would not normally also short themselves in a pay request. (D.I. 204 at 1388:25-1389:3)  Moreover, Frost testified that, when he was in possession of the truck, he drove a 12-hour day and logged it correctly. (D.I. 200 at 167:10-15)  For all of these reasons, the court does not give Frost's testimony substantial weight.

### 3.   Air Products

#### a.   Due Diligence

The evidence shows that Air Products conducted thorough due diligence on EPCO, but failed to appreciate the significance of the information it received.  Due diligence lasted approximately two months. (JTX 007)  Air Products had a team of over 50 subject matter experts, each responsible for researching their particular area of expertise. (D.I. 201 at 405:21-406:6; D.I. 202 at 719:22-720:1; JTX 007-008)  The team was led by Stanley Reggie ("Reggie") for corporate M&A, Joe Lamack ("Lamack") for business, Paul Vallone ('Vallone") for production and fulfillment, and Richard Herman ("Herman") for accounting and finance. (JTX 007-008)  Nelson Squires ("Squires") was Air Products' executive sponsor for the transaction. (JTX 007-007)  Air Products inspected six of EPCO's eleven plants. (D.I. 203 at 1006:22-1007:21)  It also reviewed,

among other things, EPCO's data room, drivers' handbook, employee handbook, and other policies and programs. (D.I. 201 at 406:8-408:13) Air Products' due diligence team had numerous discussions with Craft regarding distribution, fleet maintenance, driver management, and DOT compliance. (*Id.* at 407:10-21, 202 at 734:9-11) Reggie testified that Craft, who served as EPCO's representative, was "cooperative."[5] (D.I. 202 at 734:14-16) Air Products concluded during due diligence that EPCO's "intent was to … drive … within the legal requirements, both on a daily and weekly basis." (D.I. 201 at 406:8-408:13)

Before closing, Air Products was aware of weaknesses in EPCO's DOT compliance. One of Air Products' "key findings" memorialized in a due diligence report was that "DOT Driver logging is currently paper," which creates "[d]ifficulty in monitoring compliance." (JTX 14-003) Another "key finding" in the same report was that EPCO had a "[v]ery high out of compliance [FMCSA] score in driver hours of service and fleet maintenance." (*Id.*) Specifically, EPCO had a score of 45.9% for hours of service, compared to 3.6% for Air Products, and a score of 65.6% for vehicle maintenance, compared to 2.9% for Air Products. (JTX 009-002) Air Products confirmed the magnitude of the gap between the companies' FMCSA scores by conducting its own analysis using an internal standard. (D.I. 201 at 415:19-416:23) That analysis showed

---

[5]      Air Products argues that Craft failed to disclose information from RapidLogs and other similar data during due diligence and that, "[e]ven if such material had been timely provided, it would not on its face have revealed" the violations that led to Air Products' claims. (D.I. 206 at 23) Because Air Products ultimately asserts that it would not have mattered if Craft provided the information, the court does not address whether any of the information was actually withheld.

EPCO had "[s]ignificantly worse DOT violation rates" than Air Products: 18% versus 2%. (JTX 015-009)

Unfortunately, Air Products' only takeaway from this information was that the acquisition could raise its own FMCSA scores, making it susceptible to an audit. (*Id.*) To Vallone, the weak compliance scores reflected "some sloppiness" and a "lack of … discipline" that created an opportunity to "make the operation more efficient" and, therefore, more profitable. (D.I. 201 at 413:6-17, 421:24-422:8) It appears that Air Products did not consider what investments would be required to bring EPCO's FMCSA scores up to Air Products' standards. Presumably that would require more or better drivers and equipment, all investments Air Products made post-acquisition.

### b. Post-Closing "Discoveries"

After closing, Air Products learned that it was not a lack of efficiency that plagued EPCO, but the relentless pursuit of efficiency. Larry Camilli ("Camilli"), Air Products' Director of Customer Service and Logistics, learned from a conversation with Worley that EPCO planned its trips and schedules based on utilizing drivers for the maximum allowable 70 hours a week. (D.I. 204 at 1193:21-1194:1, 1199:1-8) Air Products, by contrast, utilizes drivers for 52 hours a week, to minimize risk of HOS violations. (D.I. 201 at 426:5-16; D.I. 204 at 1199:9-19) Accordingly, Air Products considered a number of EPCO's regular runs to be "impractical or impossible." (D.I. 201 at 424:18-425:1)

Also after closing, Vallone conducted several "onboarding" meetings with EPCO's drivers.[6] (JTX 089) Consistent with Vallone's expectations regarding discipline, he learned from the Nebraska meeting that he would be "very surprised" if "half" the drivers could pass Air Products' screening interview process, based on just their attention alone. (*Id.*) Consistent with EPCO's pre-closing FMCSA scores, Vallone learned from the Missouri meeting that some of the drivers were "not running legal on DOT hours during busy time." (JTX 089-002) At the Nevada meeting, there were "less indications" of "log issues." (JTX 089-004)

There are internal emails suggesting that Air Products had been overly optimistic in its assessments during due diligence. A year after closing, Air Products' officers and directors viewed the EPCO acquisition as a "disaster." (JTX 052-002; JTX 104) Squires emailed the team leaders that "[c]learly there were misses during due diligence." (JTX 104) Hermann echoed that sentiment. Specifically, he said:

> We also need to stop the 'woe is me' BS. Here is what people are saying about us at high levels, **right or wrong**: we did the due diligence. We missed the driver HOS. We said the plants looked good pre-acquisition. We said we can purchase better than small companies and get discounts. We said we can hire drivers and limit turnover and pay them 80% of non-CO2 drivers. We ratcheted up pay. We said that we can execute plant investments as cost effectively as them. We said the tractor/trailer fleet looks fine. We allowed our teams to spend on things that EPCO didn't spend on.

(JTX 052 (emphasis in original)) Vallone agreed, "HOS was a miss." (*Id.*)

---

[6]     "Onboarding" refers to the process that helps new employees learn the knowledge, skills, and behaviors needed to succeed in their new organizations. Tayla N. Bauer et al., *Organizational Socialization: the Effective Onboarding of New Employees*, APA Handbook of Industrial & Organizational Psychology Vol. 3, at 51-64 (2011).

23

### c. Post-Closing Management of EPCO

Although Air Products wants to attribute the losses entirely to Defendants running an illegal company, Defendants have presented evidence that other factors, including Air Products' own management of EPCO, contributed to the losses. Air Products discharged drivers on staff who did not meet its minimum requirements for years of experience. (D.I. 204 at 1239:23-1240:4) It let drivers take vacations during summer peak season, made changes to dispatch and billing that proved disruptive, had customers repeatedly run out of product, and let equipment and plant issues go unattended for days. (D.I. 204 at 1236:6-1238:25, 1241:21-1245:1; D.I. 82, Ex. 3) Tom Gannon, a senior sales and marketing executive who worked for EPCO both before and after the acquisition, testified that Air Products did not act with the same "sense of urgency" as Defendants had. (D.I. 204 at 1236:6-8)

In addition, changes to the HOS Regulations took effect on July 1, 2013, a month after closing. (D.I. 202 at 568:24-569:8; D.I. 204 at 1405:6-1406:22) These changes are estimated to have caused a 2-3% industry-wide reduction in productivity and would have made a "big impact" on carriers like EPCO that maximized their hours of service. (D.I. 204 at 1406:23-1407:25) For all of the foregoing reasons, the court cannot reasonably conclude that Air Products' losses stem only from addressing EPCO's compliance with FMCSA regulations.

### 4. Expert Testimony

The parties presented expert testimony regarding EPCO's compliance with FMCSA regulations. Lane VanIngen ("VanIngen"), a former field investigator for the FMCSA, testified on behalf of Air Products. (D.I. 202 at 585:5-7) Annette Sanberg

24

("Sanberg"), the former administrator of FMCSA, testified on behalf of Defendants.  (D.I. 204 at 1365-430)

### a.  Air Products' expert VanIngen

VanIngen determined the accuracy of EPCO's driver logs generated between October 2012 and May 2013 by cross-referencing the information in those logs with fuel data, tolling data, and payroll.  (D.I. 202 at 590:15-593:10)  He concluded that 34.7% of the logs were false.  (*Id.* at 595:4-8)  Defendants have pointed to several weaknesses in VanIngen's analysis.  More importantly, testimony suggests that VanIngen's overall conclusion has little relevance to whether EPCO was in material compliance with HOS Regulations.

VanIngen admits that he considered a number of logs false, even though FMCSA would not have considered them false or counted them towards EPCO's noncompliance rate.  (D.I. 204 at 1394:19-22)  For example, VanIngen considered a number of logs false based on speeding (e.g., he calculated that a driver did 66 miles per hour), even though FMCSA would not consider that false.  (*Id.* at 1394:17-22)  Similarly, VanIngen counted a log as false even though it was off by less than one hour or less than 50 miles.  (D.I. 202 at 681:12-21)   For example, a driver recorded his fuel stop at 3:30 p.m., but the fuel card indicated that the stop occurred at 3:20 p.m.  (*Id.*)  The FMCSA field operations training manual states that a false log does not count towards a motor carrier's noncompliance rate unless it is false by more than one hour or more than 50 miles.  (D.I. 202 at 664:25-665:13; D.I. 204 at 1391:9-1392:4)  Thus, those logs should not have been included in VanIngen's 34.7% falsification rate, if he intended the court to compare that rate to FMCSA's 10% intervention threshold.

25

VanIngen also acknowledged that he failed to account for slip-seating among EPCO's drivers.  (D.I. 202 at 658:10-659:25, 662:1-9)  Slip-seating is where two people are assigned to the same vehicle at different points in the day.  (*Id.* at 662:8-9)  VanIngen considered a driver's log false when it did not match the toll card for his assigned truck. (*Id.* at 657:4-21)  But the toll may have been recorded on another driver's log because he was the one actually in possession of the truck at that time.  VanIngen argues that even if he did account for slip-seating, the logs would probably still be false for other reasons.  (*Id.* at 651:25-652:8)

Most damaging to VanIngen's opinion is the testimony from several witnesses that log falsification and HOS violations have little bearing on each other.  VanIngen himself admitted that a motor carrier's compliance with HOS Regulations is "independent" from whether a driver's log is false.  (*Id.* at 647:8-648:16)  As VanIngen conceded, it is possible for 100% of a driver's logs to be false, but the driver to have no HOS violations.  (*Id.* at 647:8-648:16)  Vallone similarly testified that paper logs can "have lots of different kinds of errors that don't have anything to do with hours of service."  (D.I. 201 at 480:25-481:24)  Sandberg testified, "I've gone into a number of carriers where they had high falsification rates and [it] had nothing to do with their 11 and 14 and 70 [hour] compliance. So the drivers were completely compliant.  They just were terrible paperwork people."  (D.I. 204 at 1402:18-22)  Demler made the same point in reverse: the logs may look perfect, but a driver could still have HOS violations.  He testified:

> [I]f any auditor walks through the door, I don't care if your driver logs are
> perfect. If they … have any kind of head on their shoulders, they could
> very easily look at our Q7 systems, pick the driver pay miles out and
> match them up against the logs and they're not going to match up.

(D.I. 200 at 57:8-14)  Thus, VanIngen's opinions do not address EPCO's compliance with the HOS Regulations, which is the basis for Air Products' claim.  (D.I. 202 at 649:10-20)  Accordingly, the court gives VanIngen's testimony little weight.

### b. Defendants' expert Sanberg

Sandberg was asked to determine whether EPCO drivers could complete their routes in compliance with HOS Regulations and whether FMCSA would have found EPCO to be generally in compliance with those regulations.  (D.I. 204 at 1375:20-24) Sandberg concluded that EPCO was compliant with all applicable HOS Regulations before closing as FMCSA would have applied them.  (*Id.* at 1375:25-1377:1)  She also concluded that 5.5% of EPCO's trips exceeded the 11-hour rule, and 6.6% exceeded the 14-hour rule.  (*Id.* at 1385:7-11)  Both are below the 10% threshold FMCSA uses to find a motor carrier in critical violation, which would change a motor carrier's safety rating.  (D.I. 202 at 612:12-16; D.I. 204 at 1384:18-23)

To determine EPCO's pre-closing HOS compliance rate, Sandberg relied on EPCO's Q7 data from October 2012 to May 2013.  (D.I. 204 at 1386:6-14)  The Q7 data provides trip-level details, including the driver's identity, terminal, customer address, and miles paid by driver and date.  (*Id.* at 1386:6-18, 1412:24-1413:11)  From this information, Sandberg could calculate the round-trip miles for each route.  Sandberg used PC miler, a common industry tool, to determine the average miles per hour on each route.  (*Id.* at 1387:7-25)  With distance and miles per hour, Sandberg could calculate how long it should take to drive each route.  (*Id.*)  She added reasonable loading and unloading times, giving a total trip time which, if under 14 hours, would be in compliance with HOS Regulations.  (*Id.* at 1387:7-13:88-17)

27

As a cross-check, Sandberg also compared the paid miles in Q7 to the logged miles in RapidLog. (*Id.* at 1389:4-1390:7) Drivers are paid by the mile. (*Id.* at 1386:2) A driver might drop miles from their daily log, to hide how long they were driving, but drivers are unlikely to shortchange themselves by dropping miles reported to payroll. (*Id.* at 1388:25-1389:3) If drivers were falsifying logs, pay miles would be significantly higher than logged miles. (*Id.* at 1390:3-7) Demler testified that this was exactly the type of cross-check FMCSA would do to audit EPCO. (D.I. 200 at 57:8-18) VanIngen testified that typically logged miles are between six and eight percent lower than paid miles. (D.I. 202 at 635:16-636:3) Sandberg found that EPCO's variance between paid miles and logged miles was less than one percent. (D.I. 204 at 1390:19-23) Accordingly, Sandberg concluded that EPCO's drivers were not falsifying their logs. (*Id.*) Sandberg also concluded that there were "some violations" of the 11-hour and 14-hour HOS Regulations, "but under the FMCSA standard, [EPCO was] not running illegally." (D.I. 204 at 1403:5-12)

## D.   Condition of the Tangible Assets

Air Products has not been clear about its claims, but it appears to be arguing that EPCO's trailers, water cooling towers, compressors, and ammonia valve system were not in "good working condition" upon closing as required by the SPAs. (D.I. 206 at 18-19, 33) Air Products' evidence on these issues was admitted through the testimony of Douglas Sarbaugh ("Sarbaugh"), the fleet asset and operations manager for Air Products. There is no evidence in the record regarding what qualifies as "good working

28

condition" for these assets.[7]  Instead, Air Products has litigated on the assumption that any maintenance or repairs performed at any time after closing necessarily means the asset was not in good working condition.  Intuitively, that cannot be correct, as a vehicle with worn brake pads, dented hood, cracked mirror, and missing windshield wiper blades may still be in good working condition; i.e., those repairs do not necessarily prevent the vehicle from being driven.

In addition, Air Products has not submitted any evidence regarding the condition of the assets **as of** closing.  The bulk of Air Products' evidence on these claims are invoices.  (JTX 352 - JTX 354, JTX 358 - JTX 360, JTX 365, JTX 386 - JTX 393, JTX 396, JTX 407 - JTX 408, JTX 410 - JTX 425, JTX 427 - JTX 431, JTX 461 - JTX 463, JTX 465, JTX 527 - JTX 528, JTX 566 - JTX 567, JTX 569 - JTX 573, JTX 577, JTX 579, JTX 581 - JTX 586, JTX 588 - JTX 590, JTX 793 - JTX 795, JTX 797, JTX 801 - JTX 803)  The earliest dated invoice, however, is May 30, 2014, approximately one year after closing.  (JTX 352)  Thus, the invoices alone are not sufficient evidence that the assets were not in good working condition as of closing.  Air Products has presented additional evidence regarding the condition of the trailers (but not other equipment) in the form of photographs and testimony.  Before discussing that evidence, however, the court provides several other reasons why the invoices by themselves are entitled to little weight.  Finally, the court will address Defendants' arguments that these claims should

---

[7]     Sarbaugh testified that EPCO did not follow "Department of Transportation rules and regulations to keep the vehicles up," but he did not identify the specific rules and regulations to which he referred.  (D.I. 203 at 971:22-16)  Sarbaugh also testified that EPCO did not "follow the manufacturer's … safety protocol" to maintain vehicles, but again did not elaborate on what those protocols entailed or what evidence supported his conclusory assertion.  (Id. at 973:11-19)

be subjected to the anti-sandbagging provision, because Air Products received
information during due diligence that accurately reflected the condition of the fleet. (D.I.
207 at 50-52)

### 1. Invoices

Although the invoices could be useful for calculating damages, they are, for
several reasons, not helpful in proving a breach of the representations and warranties in
Section 4.7. Air Products did not provide any testimony explaining why the work
reflected in the invoices was performed. This lack of context makes several invoices
appear irrelevant, because the invoices on their face have no obvious connection to the
good working condition of the assets. For example, five invoices show Air Products
paid $8,271.46 to rent a forklift and several boom lifts. (JTX 417; JTX 418; JTX 422;
JTX 424; JTX 425) Two invoices show that Air Products paid $22,300 to install "a
heavy duty concrete sidewalk." (JTX 412; JTX 413) Vallone admitted on cross-
examination that he has no personal knowledge as to why the sidewalk was installed,
but assumed it was related to the water cooling tower. (D.I. 201 at 445:7-11, 463:18-
464:10) One invoice shows that Air Products paid Team Industrial Services, Inc.
$1,127.50 for a non-destructive evaluation ("NDE"). (JTX 429; D.I. 201 at 442:17-22) It
did not identify what Team Industrial Services evaluated.

Similarly, without context, several invoices appear to represent regular
maintenance or wear and tear, which is the responsibility of Air Products post-closing.
Three invoices show that Air Products paid $14,681.46 to have the Claremont water
cooling tower cleaned. (JTX 411; 415) One invoice in the amount of $12,571.58 was
for changing out filters on a compressor. (JTX 388-009) Air Products admits that

30

replacing lights, tires, and wheels on a trailer are normal wear and tear. (D.I. 203 at
966:16-968:4) Nevertheless, it has claimed damages in the amount $85,868.39 for
work on trailer 130 even though $6,544.40 of the invoice covered lights, tires, and
wheels. (JTX 353; D.I. 203 at 988:24-989:1) Similarly, Air Products seeks $35,115.86
in damages for work on trailer 208. (JTX 352) But Sarbaugh testified at trial that the
only items on the invoice outside normal wear and tear was the sandblasting, painting,
and replacement of the hydraulic lines, upper coupler frame, and dolly leg frame. (D.I.
203 at 987:18-988:11) Accordingly, by Air Products' own admission, it cannot recover
$19,139.91 out of the $35,115.86 sought.[8] (JTX 352)

Several invoices are for emergency services required over a year after closing.
Air Products seeks damages in the amount of $7,197.37 for emergency services
provided by an industrial cleaning company on August 24, 2014. (JTX 414) Air
Products also seeks $1,688 for an after-hours emergency on June 6, 2014. (JTX 392-
002) An "emergency" is "a serious situation or occurrence that happens unexpectedly
and demands immediate actions." The Am. Heritage Dictionary (4th ed. 2009). With no
other evidence regarding what caused the emergency, it is not reasonable to infer that
the causes existed as of closing but took over a year to manifest.[9]

---

[8]    The labor cost $5,695.00 for the upper coupler frame, $4,675.00 for the dolly leg
frame, and $2,975.00 for the sandblasting. The materials cost $1,828.55 for the upper
coupler frame, $765.62 for the dolly leg frame, and $2,300.00 for the sandblasting. The
hydraulic lines were not itemized but a part of a lump sum amount of $909.74 for
additional items not included in the estimate.

[9]    Moreover, if Air Products is claiming that there were latent defects that did not
manifest until well after closing, it would have to submit evidence, per Section 4.7 of the
SPAs, that Craft and Wiesemann had knowledge of these latent defects, which it did
not.

Some invoices reflect work done to address perceived design flaws in the assets, which is not a breach unless Air Products also proves that EPCO had knowledge of the design flaws.[10] For example, Air Products hired Carson & Stewart Refrigeration, Inc. ("Carson") in October 2014 to not only install a new condenser unit, but to change the design of the support system. (JTX 407) Carson replaced a single pressure relief valve ("PRV") with a dual PRV, added "relief piping," and added an additional water pipe line. (*Id.*; JTX 428; JTX 431) These design changes cost $39,007.40. (JTX 407; JTX 428; JTX 431) Similarly, Air Products paid $472,228.69 to make changes to the ammonia relief valve systems at several facilities, purportedly to comply with OSHA Regulations. (D.I. 206 at 20) Air Products did not elaborate on which OSHA Regulations. Air Products also did not present any evidence to show that EPCO had knowledge of any design flaws in the water cooling towers, compressors, or ammonia relief valve systems. Finally, Air Products did not submit any invoices or evidence other than the testimony of an interested witness to substantiate Vallone's testimony that Air Products paid $770,000 to replace a seven-year-old water cooling tower at the Milton facility and $710,000 to replace a five-year old water cooling tower at the Nevada facility. (D.I. 201 at 440:2-14; D.I. 206 at 19)

### 2. Photographs

Through the testimony of Sarbaugh, Air Products admitted twelve photographs showing rusted parts of trailers. (JTX 286-05; JTX 286-06; JTX 291-03; JTX 323-08; JTX 330-02; JTX 335-02; JTX 337; JTX 338; JTX 339; JTX 340; JTX 342; JTX 347) He

---

[10] As explained above, Section 4.7 of the SPAs states that the Tangible Assets are, to the "Company's Knowledge, free from design or structural defects including any latent defects." (JTX 839-021)

32

did not take the photographs himself. (D.I. 203 at 975:22-23) As a normal part of
EPCO's operations, each trailer is assigned its own unique number, but Sarbaugh did
not know which trailers the photos depicted. (*Id.* at 983:6-984:14, 1014:22-25) As
Sarbaugh testified, "It could be multiple trailers," or "[i]t could be one." (*Id.* at 1014:22-
105:5) In addition, Sarbaugh did not know when the photographs were taken. (*Id.* at
1013:15-1014:21) It could have been several months to over a year after closing. (*Id.*
at 1013:21-1014:10) Accordingly, Air Products did not provide persuasive evidence that
the photographs accurately depicted the condition of EPCO's fleet on the day of close.
(D.I. 203 at 1016:11-1017:22) For all of these reasons, the court gives these
photographs little weight.

Through the testimony of Vallone, Air Products also admitted five photographs of
a leaking water cooling tower at Claremont, Minnesota. (JTX 401; JTX 405; D.I. 201 at
433:5-436:2) Vallone did not testify when these photographs were taken, but the fact
that the tower is covered in ice suggests it was winter time. Because closing was in
spring 2013, these photographs could not have been taken until several months after
closing when temperatures dropped in the winter time to below freezing. Accordingly,
the photographs do not necessarily depict the condition of the Claremont water cooling
tower at closing. Vallone testified that small leaks in a tower not corrected in a timely
manner can become much larger leaks, resulting in a "much more pronounced
corrosion problem." (D.I. 201 at 434:24-434:8) If Air Products is claiming that there
were latent defects in the water cooling tower that did not manifest until well after
closing, it would have to submit evidence, per Section 4.7 of the SPAs, that Defendants
had knowledge of these latent defects, which it did not.

33

### 3.   Testimony

Air Products relies on the testimony of Demler and Frost to support its claim that EPCO's trailers pre-acquisition were in "gross disrepair." (D.I. 206 at 16-17) Demler testified that EPCO trailers were "duct tape and bailing wire." (D.I. 200 at 81:16-82:4) Frost testified that the power units were "fair," the trailers were "worn out," the truck kept breaking down while he was training, and the equipment "was just taken care of enough to get by with." (*Id.* at 186:8-187:13) Although the testimony adds color to Air Products' assertions, Demler's testimony cannot be taken literally, and Frost's testimony is his subjective judgment.

### 4.   Due Diligence

Air Products claims that it did not notice the widespread "gross disrepair" of EPCO's fleet during due diligence inspections. (D.I. 206 at 18) In contrast, the record indicates that, during due diligence, Air Products found that "EPCO fell within very close proximity to the intervention threshold for fleet maintenance" and would "need some guidance" to get vehicle maintenance back on track. (D.I. 203 at 1002:16-1003:18; *see also* JTX -003 (noting that EPCO had a "[v]ery high out of compliance CSA score" for fleet maintenance)) Nevertheless, Air Products concluded that "the tractor/trailer fleet look[ed] fine." (JTX 052-002) Air Products has not been able to explain this disconnect between its findings and its conclusions.

In addition, Air Products conducted six site visits. The due diligence team was instructed to look at the fleet for rust signs, overall condition, and roadworthiness. (D.I. 203 at 1005:20-1006:20) The team reported back that it did not uncover "any significant concerns." (JTX 017) At trial, Sarbaugh attempted to explain this oversight by testifying

that there was "limited equipment available" to inspect. (D.I. 203 at 969:1-6) Nevertheless, Sarbaugh was impeached by his previous sworn testimony that he did not know how many tractor-trailer units the due diligence team inspected. (*Id.* at 1006:22-1007:21)

### E.    Craft's Consulting Agreement

On May 15, 2013, Craft and Air Products executed a consulting agreement whereby, post-closing, Craft would: (i) "support the integration of EPCO into [Air Products];" and (ii) "provide consultation to [Air Products] on the operation of the business." (JTX 726) Per the terms of the agreement, Craft's consultancy would start on June 1, 2013 and continue for an initial period of twelve-months, with an additional six-month period unless either party gave notice before the end of the initial period. (*Id.*) Accordingly, by its own terms, the consulting agreement would expire on November 30, 2014. Air Products and Craft amended the consulting agreement on March 21, 2014 and October 31, 2014. (D.I. 185 at ¶¶ 70-71) Those amendments have not been admitted into the record.[11]

On November 21, 2014, the same day it filed the complaint in this action, Air Products sent Craft a notice that it was terminating the consulting agreement, effective immediately. (D.I. 1; JTX 931-002) The notice stated that Air Products had terminated the agreement "due to material misstatements made by [Craft] to Air Products prior to the execution of the Agreement." (JTX 931) Attached to the notice was a copy of the complaint. (*Id.*)

---

[11]    A copy of JTX 114, which included the amendment dated October 31, 2014, was included in post-trial briefing, but this exhibit was not admitted at trial. Therefore, the court will not consider it.

35

## III.   CONCLUSIONS OF LAW

Air Products asserts the following claims: (i) breach of contract based on the conditions of certain tangible assets and compliance with HOS Regulations; (ii) securities fraud; (iii) common law fraud and negligent misrepresentation; and (iv) unjust enrichment. (D.I. 48 at ¶¶ 183-340)  Craft has asserted a counterclaim for breach of contract based on the consulting agreement.  (D.I. 57 at ¶¶ 135-39)

### A.   Breach of Contract and Declaratory Judgment

In counts 3, 4, and 5 of the complaint, Air Products claims that the quality of EPCO's trailers, water cooling towers, compressors, and ammonia valve system breached the representations and warranties in Section 4.7 of the SPAs that all Tangible Assets were in "good working order." (D.I. 48 at ¶¶ 201-28)  In count 1, Air Products claims that EPCO's noncompliance with FMCSA's HOS Regulations constituted a breach of the representations and warranties in Section 4.23.1 of the SPAs that EPCO conducted its business and affairs in compliance with all material Legal Requirements.  (D.I. 48 at ¶¶ 183-91)  Air Products has failed to sustain its burden of proof on these claims.

To establish a breach of contract, a plaintiff must prove by a preponderance of the evidence (i) "the existence of the contract," (ii) "breach of an obligation imposed by that contract," and (iii) "resultant damage to the plaintiff." *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).  The parties do not dispute the existence of a contract, only the breach and damages.  The court finds that Air Products has not proven that a breach occurred and, therefore, does not address damages.

The SPAs promise that the representations and warranties "shall be true and correct in all material respects ... as of the Closing Date," which was May 31, 2013.

(JTX 839-051; JTX 721-039) Air Products has presented no evidence regarding the condition of the trailers, water towers, compressors, and ammonia valve system as of May 31, 2013, and no grounds on which the court can reasonably infer that the evidence presented regarding the conditions of these assets several months later accurately reflects what existed on the closing date. Accordingly, Air Products has failed to prove that Defendants breached Section 4.7 as of the closing date.

As for the HOS claim, Air Products had to prove under Section 4.23.1 that EPCO was not compliant with "all material Legal Requirements." (JTX 839-034; JTX 721-027) Air Products also had to prove that the non-compliance made Section 4.23.1 not true "in all material respects." (JTX 839-051; JTX 721-039) Material means, "[o]f such a nature that knowledge of the item would affect a person's decision-making process." Black's Law Dictionary (7th ed. 1999). The fact that FMCSA itself has designated all of the regulations used to determine a safety rating "acute and critical," suggests that those regulations in the aggregate are material. There is an argument to be made that EPCO was in compliance with all material FMCSA regulations, because there is a preponderance of evidence, in the form of Sandberg's testimony, that FMCSA would not have downgraded EPCO's safety rating under the circumstances. (D.I. 204 at 1403;5-12) In addition, Air Products has failed to show that knowledge of EPCO's poor compliance with HOS Regulations would have affected its decision-making process. Air Products was aware before closing of EPCO's "[v]ery high out of compliance [FMCSA] score in driver hours of service and fleet maintenance." (JTX 14-003) Nevertheless, Air Products closed on the transaction. For all of these reasons, Air Products has not shown a breach of Section 4.23.1.

The court grants judgment in favor of Defendants and against Air Products on counts 1, 3, 4, and 5 for breach of contract.[12]  Count 8 of the complaint asks the court to declare that Defendants breached the representations and warranties in the SPAs and are jointly and severally liable to indemnify Air Products for damages resulting from those breaches. (D.I. 48 at ¶¶ 247-52, Prayer for Relief ¶ 8)  Because Air Products has not shown a breach of contract, judgment is granted in favor of Defendants and against Air Products on count 8.

## B.    Securities Fraud (Counts 9, 10, 14, 15)

In counts 9 and 10 of the complaint, Air Products claims that Wiesemann and Craft, respectively, committed securities fraud under Section 10(b) the Securities Exchange Act and Rule 10b-5. (Id. at ¶¶ 253-78)  In counts 14 and 15, Air Products claims that Wiesemann and Craft, respectively, are jointly and severally liable as control persons under Section 20(a) of the Securities Exchange Act. (Id. at ¶¶ 300-23)

For liability under Section 10(b), Air Products must prove "(1) a material misrepresentation or omission by the defendant, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation." Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008). For liability under Section 20(a), Air Products must prove that Wiesemann and Craft

---

[12]    Air Products did not pursue its claims at trial or in post-trial briefing for breach of contract based on overweight trip compliance (count 2), customer, vendor, and source agreements (count 6), and environmental violations at the Malta Bend site (count 7). (D.I. 48 ¶¶ 192-200, 229-46)

controlled another person or entity that committed a primary violation of the securities laws. *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 279 (3d Cir. 1992).

Air Products gave scant attention to these claims. In post-trial briefing, it did nothing more than set forth the elements of the claim and make the conclusory assertion that those elements have been met. (D.I. 206 at 35-36) Air Products did not identify the material misrepresentation or omission, the acts it took in reliance upon that misrepresentation, or the facts that constitute loss causation. Accordingly, Air Products has failed to carry its burden on counts 9, 10, 14, and 15. Judgment on these counts will be entered in favor of Defendants and against Air Products.

## C. Common Law Fraud & Negligent Misrepresentation

Counts 11 and 16 are against Wiesemann and Craft, respectively, for common law fraud. (D.I. 48 at ¶¶ 279-96) To prevail on a claim for fraud, Air Products must prove that: (1) Wiesemann and Craft falsely represented or omitted facts they had a duty to disclose; (2) Wiesemann and Craft knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) Wiesemann and Craft intended to induce Air Products to act or refrain from acting; (4) Air Products acted in justifiable reliance on the representation; and (5) Air Products was injured by its reliance. *DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 958 (Del. 2005). The first element of fraud can be established one of three ways: (1) an overt misrepresentation; (2) silence in the face of a duty to speak; or (3) active concealment of material facts. *H-M Wexford v. Encorp, Inc.*, 832 A.2d 129, 144 (Del. Ch. 2003); *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983). In its post-trial briefing, Air Products made the conclusory assertion that "all three flavors of fraud are

present," without identifying which specific statements or acts constituted a misrepresentation, omission, or active concealment, and explaining why. (D.I. 206 at 37)

If the court were to construe the post-trial briefing liberally, Air Products may be claiming that Wiesemann and Craft made an overt misrepresentation, because "the trailer schedules were blatantly false." (*Id.* at 35, 37) But Air Products does not explain what it means by "trailer schedules" or cite to the record where those trailer schedules appear.[13] It is plaintiff's burden at trial to prove the elements of common law fraud by a preponderance of the evidence. *Tracinda Corp. v. DaimlerChrysler AG*, 364 F. Supp. 2d 362, 389 (D. Del. 2005). Air Products has failed to do so.

Air Products also has not shown that Wiesemann and Craft had a duty to speak. (D.I. 207 at 46) An affirmative obligation to speak arises only where there is a fiduciary or other special relationship of trust and confidence between the parties. *Prairie Capital III, L.P. v. Double E Holding Corp.*, 132 A.3d 35, 52 (Del. Ch., 2015). "In an arms' length contractual setting like the negotiation of the SPA, a party has no affirmative duty to speak." *Id.*; *Corp. Prop. Assoc. 14 Inc. v. CHR Holding Corp.*, 2008 WL 963048, at *6 n. 51 (Del. Ch. Apr. 10, 2008) (explaining that a party to a business transaction is not

---

[13]      If the court were to guess, Air Products might be referring to Schedule 4.7 of the LLL SPA, but the plain language of the schedule itself does not purport to represent the condition of the trailers. Schedule 4.7 is titled "Assets Not in Possession of Company," and states in its entirety: "Those assets subject to the Master Equipment Lease dated March 2, 2000 between [LLL] and EPCO. See those specific maintenance issues referenced in the attached list." (JTX 722-071) The attached list states, among other things, that two trailers are "wrecked," and recovery may be obtained from insurance. (JTX 722-072) Air Products has not explained why this schedule or any attachment to the schedule should be construed as anything other than what it purports to represent: a list of assets not in possession of the company.

liable for harm caused by a failure to disclose facts he knows the other party would regard as material); *Airborne Health, Inc. v. Squid Soap, LP*, 2010 WL 2836391, at \*9 (Del. Ch. July 20, 2010) ("A party has no affirmative disclosure obligation to 'an arms' length counter-party negotiating across the table ...."). Once a party in an arms' length negotiation does speak, it cannot do so partially or obliquely such that the statements become misleading. *Prairie Capital*, 132 A.3d at 52. But Air Products has not identified any partial disclosures that were misleading.

Air Products claims that Craft and Wiesemann "hid[] the truth" regarding hours of service issues, but do not explain how. (D.I. 206 at 35) A claim of fraud by active concealment requires proof that defendants "took some affirmative act designed or intended to prevent, and which does prevent, the discovery of facts giving rise to the fraud claim. *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Tech. Inc.*, 854 A.2d 121, 144 (Del. Ch. 2004); *Eurofins Panlabs, Inc. v. Ricerca Biosciences, LLC*, 2014 WL 2457515, at \*14 (Del. Ch. May 30, 2014). Active concealment requires more than mere silence. *Wiggs v. Summit Midstream Partners, LLC*, 2013 WL 1286180, at \*11 (Del. Ch. Mar. 28, 2013).

Finally, Air Products never responded to Wiesemann and Craft's argument (D.I. 207 at 45) that "[a] breach of contract claim cannot be 'bootstrapped' into a fraud claim merely by adding the words 'fraudulently induced' or alleging that the contracting parties never intended to perform." *Pinkert v. John J. Olivieri, P.A.*, 2001 WL 641737, at \*5 (D. Del. May 24, 2001) (quoting *Iotex Commc'ns, Inc. v. Defries*, 1998 WL 914265, at \*5 (Del. Ch. Dec. 21, 1998)). As a general rule under Delaware law, "where an action is based entirely on a breach of the terms of a contract between the parties, and not on a

violation of an independent duty imposed by law, a plaintiff must sue in contract and not in tort." *ITW Global Inv. Inc. v. Am. Indus. Partners Capital Fund IV, L.P.*, 2015 WL 3970908, at *6 (Del. Super. June 24, 2015). Air Products has not explained why its fraud claims would not run afoul of this general rule under Delaware law. For all of these reasons, Air Products has failed to carry its burden of proof on its common law fraud claims. The court will enter judgment against Air Products and in favor of Wiesemann and Craft on counts 11 and 16.

Counts 12 and 17 are against Wiesemann and Craft, respectively, for negligent misrepresentation. (D.I. 48 at ¶¶ 279-96) "To recover on its claims for negligent misrepresentation under Delaware law, [Air Products] must prove largely the same elements as for its claim for fraud, except it need not establish scienter; negligence would suffice." *Oracle Partners, L.P. v. Biolase, Inc.*, 2014 WL 2120348, at *18 (Del. Ch. May 21, 2014). Air Products' common law fraud claims failed without even reaching the issue of scienter. Thus, the negligent misrepresentation claims, likewise, fail. The court will enter judgment against Air Products and in favor of Wiesemann and Craft on counts 12 and 17.

### D. Unjust Enrichment

Count 13 of the complaint alleges that Defendants were unjustly enriched at Air Products' expense by making false representations and warranties in the SPAs that induced a sale of stock for a higher price. (D.I. 48 at ¶¶ 297-99) "Delaware courts ... have consistently refused to permit a claim for unjust enrichment when the alleged wrong arises from a relationship governed by contract." *Nemec v. Shrader*, 2009 WL 1204346, at *6 (Del. Ch. Apr. 30, 2009), *aff'd*, 991 A.2d 1120 (Del. 2010); *Veloric v. J.G.*

*Wentworth, Inc.*, 2014 WL 4639217, at *19 (Del. Ch. Sept. 18, 2014) ("This Court routinely dismisses unjust enrichment claims that are premised on an express, enforceable contract that controls the parties' relationship because damages is an available remedy at law for breach of contract." (quotation marks omitted)).  Here, a valid and enforceable contract governs the parties' relationship and is the basis of Air Products' unjust enrichment claim.  Accordingly, the unjust enrichment claim fails as a matter of law.  Judgment on count 13 will be entered in favor of Defendants and against Air Products.

## E.    Breach of the Consulting Agreement

As explained above, a plaintiff cannot recover on a breach of contract claim, unless it proves by a preponderance of evidence: (i) the existence of a contract; (ii) breach of an obligation in that contract; and (iii) damages.  *VLIW Tech.*, 840 A.2d at 612.  Air Products claims that it terminated Craft's consulting agreement based on material misstatements and non-performance.  (JTX 931-002; D.I. 208 at 39)  Specifically, Craft did not properly explain EPCO's HOS problems and offer potential solutions.  (D.I. 208 at 39)  Neither party addressed under what circumstances Air Products had the right to terminate the contract.  The contract itself is silent on the issue of termination.  Moreover, Craft claims $90,000 in damages without explaining how he arrived at that amount or identifying the evidence in the record that supports his damages claim.  (D.I. 207 at 60)  Accordingly, Craft failed to prove a breach of contract by a preponderance of the evidence.  The court will enter judgment on Craft's counterclaim in favor of Air Products and against Craft.

## IV.   CONCLUSION

For the foregoing reasons, judgment on the claims in the complaint (D.I. 48) is granted in favor of Defendants and against Air Products. (D.I. 48) Judgment on the counter-claim (D.I. 57) is granted in favor of Air Products and against Craft. (D.I. 57) An appropriate order shall issue.